This is Michael McCranie. We need some oil there, don't we? Apparently, law degrees do not help with the working of the water pitcher. Good morning. Good morning. May it please the Court. My name is Robert George and I'm here today on behalf of the appellant, Michael McCranie. Mr. McCranie is in the courtroom today behind me. As I'm sure that y'all are aware by reading the briefs, this case involves what I would consider a complicated and pretty detailed transaction involving the purchase of insurance agency assets. I think because of the nature of this transaction, the complexity of it, the fact that it's probably not the sexiest subject matter in the world, I think it is very easy to look at this at a 20,000-foot level and convenient just to see the documented issue as a promissory note, the two-page document that's untitled. What my client and I are asking you to do is to really drill down in the detail of the numerous documents that issue and I'm confident that if you do, you will see that this documented issue, the two-page document, is not a promissory note and that this is really more of a contract for the sale of goods and my client is not liable for the damages claimed by the Eppley DZ Bank. And there's some case law from Kansas, which I understand Kansas law governs this dispute, that supports what you're saying. I'm not sure the instruments do, but there's Kansas law that says where there are two or more instruments executed by the same parties contemporaneously or even at different times that concern the same subject matter, then you read them together and construe them together. Yes, Your Honor. And I think not only the case law, but the actual documents that we're looking at, if you look at all the documents in their entirety, you'll see that they have to work together. And if I could just briefly, I'm not going to go through, I'd be, I'd use all my time going through the facts. I don't want to do that, but really on October 30th, 2000, my client entered into a series of documents with Brooke Credit Corporation. Brooke Credit Corporation was the or financed the purchase. He also entered into a series of agreements with Brooke Corporation. And again, this, the basis of this was Brooke Corporation. They were a national insurance agency. They were trying to expand their footprint of insurance agencies around the country. They would locate agencies for sale. They would then enter into an agreement with that seller. They would then find someone to be their franchisee to purchase that insurance agency. And they would have essentially a sale from Brooke to the franchisee. Just as part of those agreements, the agreements between my client and Brooke Credit, they included the Advancement of Loan Agreement. I think what's important about the Advancement of Loan Agreement is that he had to assign all of his rights, title, and interest to the insurance agency assets to Brooke Credit at that time. So at the very moment he executed those documents, he never was transferred the title or interest in those assets that he was purchasing. They were immediately transferred and assigned to Brooke Credit. Those agreements also required Mr. McCraney to serve as a franchisee under Brooke, under certain terms and conditions of the agreements with Brooke. And that brings us to the agreements with Brooke. They included a franchise agreement which required Mr. McCraney to allow Brooke to be the agent of record, which is a term of art in the insurance industry, which means they're the owner and holder of all the contracts with the insureds and the insurance companies. In essence, my client was really an employee of Brooke during this time working to pay off the debt. And the way the money would, because Brooke was the agent of record, they would receive the premiums. They would apply the premiums to the debt to Brooke Credit. They would then apply a percentage to themselves as a servicing fee. And then they would pay my client the remainder. My client never made any type of loan payments or anything like this. This was all this one big process. And also, there were agreements between Brooke Corporation and Brooke Credit regarding the preservation of collateral. And I will say this. I know you started your comment by saying this is a very complex and complicated transaction, and I don't mean to oversimplify it. But as I understand what your opponent's argument is, in essence, is it's no different than if you buy an automobile from Chevrolet and finance it with General Motors Acceptance Corporation, and the car turns out to be a lemon. You still owe the debt. You may have a claim against Chevrolet, but you still owe the money. And to me, that's sort of, like I said, I don't mean to oversimplify, but that seems that at the bottom, that seems to be their argument. You bought it from Brooke, Brooke sets up a separate financing arm, and you finance it through Brooke. You could have financed it directly with DZ Bank if you wanted to. But so why does that argument not apply? That is a very good argument. I mean, a very good question. I'll tell you why it doesn't apply, because in the car analogy, you receive the title to the car. It might be a bad car, but at least you got title to it. At least you own that lemon of a car. In this case, my client never received the title of the car. It's somewhat similar to Uber. I don't know if you're aware that Uber has started trying to expand its footprint and the number of drivers, the quality of cars its drivers are using by financing the purchase of cars. And if you look and think of it that way, I think this is the better analogy, where Uber uses a third party to finance its driver's purchase of new cars. But think of it this way, where that driver, when he buys that car, he has to immediately sign all of his rights, title, and interest to the creditor or to the credit company. He then has to agree to only use that car driving for Uber. Uber then receives the money for all that contract and then pays the driver. What happened here was, is that through no fault of Mr. McCraney, the Brooke agency failed. It'd be like if Uber failed. Uber stopped, if Uber stopped paying its drivers, the insurance company stopped paying Mr. McCraney for three months. At the end of those three months, what was he to do? He called and said, and said, please, let me have the title to the car like it would be of the lemon. Let me do that so I can preserve the collateral. They refused to do that. The only thing he did, he terminated the contract. He canceled the contract. He said, have your car back. Have your lemon back. Have your insurance agency back. He gave that back to them. There's a big difference between buying a car and this is a little different situation because he never owned the car. Let me ask you another question. If we instrument, where does that lead us? Well, then that puts you into what the document really is, which is a contract for the sale of goods or really an installment contract. Under that, the seller has a duty to provide what is being purchased. The buyer has an obligation to pay for and accept those goods. That never happened here. Unfortunately, like I said, my client never received the goods that he contracted to purchase. He never received any title, any right, or any, the only thing he did get, pursuant to his, the agreement for advancement of loan, he was entitled to use those assets while he was not in default. That's all he got. It'd be like that Uber driver. He got to drive the car for Uber as long as he was complying with all the terms and terms. Just to follow up on Judge Mowey's question, if we made the legal decision that this was not a negotiable instrument, what's the legal analysis that follows from that? I mean, I understand your analogies and everything, but just in terms of writing the order, what happens from there? Yeah, I'm not really sure. You mean the procedural issue or the legal? You're writing the opinion. First paragraph is no, no negotiable instrument. What is, what does the rest of the opinion say in terms of directing the parties and sending the case back? After saying the first sentence of judgment for my client, I think I would go on to, to describe that as, like I said, it is a part of a larger contract for the sale of goods. There was no consideration for, for those goods. And my client, or I should say my client never received title to those goods that he was purchasing. He properly canceled the contract and is under no other duty to perform under that contract. There is an issue of consideration. I know that DZ Bank has argued the fact that, oh, because my client was able to use those assets, it's consideration. However, the contract for the sale of goods, just because you get to use it, doesn't mean you actually receive those goods. In this case, my client did not receive the goods he was buying. Just an example, I'm from Jacksonville. We just got done with the players championship. My son, I have a 12 year old son, loves the game of golf. And as you can imagine, he wants the best and most expensive equipment you can imagine. So let's say he goes and I himself through the pro shop, maybe on some sort of installment deal. He buys it. They say, hey, listen, you can use it here at the course whenever you want to, but you need to leave it here until it's paid off. He does, but let's say the pro shop loses it. He was buying that driver. He didn't get the driver. Sure. He was able to use it. Does that mean the fact that they lost it? Does that mean that he would have to continue paying on that driver? He was buying, he was entering that contract to buy that driver. Let me ask you about, so your fundamental premise is that all of these agreements were essentially one transaction, one agreement, but the advancement agreement has an integration clause that excludes the purchase agreement and the franchise agreement. What do you make of that? It doesn't exclude it. It has an integration clause, but that still doesn't stop the fact that the integration clause includes in it numerous other conditions and one of the conditions is that my client cannot be in default, has to comply with the terms of the franchise agreement. That goes to the negotiability issue, right? It goes to the notion, definitely goes to negotiability. I mean, I think the, I'm almost out of time, but Kansas law is clear. A negotiable instrument has been unconditional promise to pay and cannot contain any other obligations. I think there are numerous of them. But how does it affect your sale of goods argument? I'm out of time. Do you want me to? You can answer the question. So how does it affect the sale of goods argument? How does the integration clause affect that argument about the sale of goods, that this is a sale of goods? Well, again, I'm not sure if I, well, on that agreement, it even says it's for the purchase of agency assets. The advancement agreement itself references this is for the purchase of agency assets. It's clear on that document what the purpose of that agreement is for. That's just the mechanism where he's paying for it. And that agreement also includes the obligations of the franchise agreement. The agency agreement also requires that my client be able to use those assets as long as he's not in default. My client was never in default before they stopped paying, before the assets just dwindled away because of the actions of Brooke. So the actual agreement itself provides for the terms that would allow my client to not be responsible for any further payments under that agreement. Thank you. Good morning, Alex D'Arcy for DZ Bank. This is a negotiable instrument, and I think the court should look at the official comment to section 106. And to give you some perspective on this, I know you may not be, I know this is an article three thriller and an article nine thriller, and just think back to maybe some corporate experience you have. But the standard docs that banks use are LaserPro documents. The standard document would be a note, a security agreement, and a business loan agreement. And the only thing that's different here, instead of a business loan agreement, we have the agreement for the advancement of loan. It's substituting for the business loan agreement in your standard LaserPro doc package. And if you look at official comment one to 106, it lays that out for you. It says many notes and commercial transactions are secured by collateral, are subject to acceleration in the event of default, or are subject to prepayment. A statement of rights and obligations concerning collateral prepayment or acceleration does not prevent the note from being an instrument if the statement is in the note itself. In some cases, this is the key part, it may be convenient not to include a collateral prepayment or acceleration in the note, but rather to refer to an accompanying loan agreement, security agreement, or mortgage for that statement. That's exactly what's happened here. The only thing that they can point to as an affirmative undertaking of a lender is not to interfere with a collateral. But we don't have that right to interfere with a collateral in the warranty of quiet enjoyment that you see in standard loan documents all the time. And the cases that we've cited to you, the courts are bending over backwards to find these documents to be instruments when they look like instruments and they look like notes. So if you look at the New York cases, the one notes were contingent upon the vendor delivering the equipment. It was a contingency to the notes being effective. They still found the agreement negotiable. So the fact that there's this tiny undertaking doesn't take it out of Article 3. And I think the second dangerous part of this case is to consider this an integrated agreement as if all of the Brook entities were one and the same without any evidence of piercing. I mean, this document is, this transaction is structured intentionally to make the lender bankruptcy remote. So I mean, there's no question what was going on here. We have Brook Corporation, which is the franchisor and seller of the agency, which by the way, is not a sale of goods and is not subject to Article 2. That's not a sale of goods. That's a sale of a franchise. That does not qualify as a sale of goods under Article 2. And then you have the lender, which is Brook Credit Funding, which is the borrower under DC Bank's facility. And that facility is subject to a borrowing base. And so all of that is set, while the transactions are related, they're legally separate. And they're legally separate by virtue of the integration clauses. Can we kind of peel this away a little bit? Sure. You start by saying it's clear this is a negotiable instrument. Now, what makes it the collateral? Now, your opponent argues, well, we didn't even own the collateral. This is what then pledges the collateral security. And to take it one step further, it integrates the advancement for a loan, which includes repayment terms, which includes the provisions about the commissions, includes the provisions about title. So why doesn't that take it out of the negotiable instrument context? Well, some of it's insurance specific, okay? So the way this business works, Mr. McCraney is what they call an independent agent. The big carriers won't deal directly with an independent agent. They have to go through what they call a managing general agent. That's what Brook Corporation is. Brook Corporation is the managing general agent. So it technically holds the policies for the benefit of both the carriers and the independent agent, but the carriers will only deal with Brook Corporation. So they own the assets? I mean, other than maybe a little office furniture or something like that, but I mean, they own the assets that are worth anything, right? I've litigated 300 of these cases, so let me tell you how this plays out. So we sued in the Western District of Washington Connect Insurance. Connect Insurance came in and grabbed the customer list from the agent, even though we had a UCC one against the equivalent of Mr. McCraney. We sued them. We went to trial with Judge Robart, the same judge who issued the other DZ opinions in the Western District of Washington, and we won about $585,000 for the conversion of our collateral. So that business relationship, the names of the customers, that's the benefit that Mr. McCraney always has, regardless of who manages that relationship with the carriers, because he's the person interacting with the customer. So if he tells the customer that, hey, this year... I understand all that, but you start it by saying it's a negotiable instrument because he's pledging the assets, but he doesn't own anything to pledge. I think he's retained rights, if you will. In other words, he's assigned it to Brooke to manage the relationship, but he has that... There's a property interest in the customer relationship, and that's... And the only way I can demonstrate to you that that exists... Did he pledge that? Yes. He pledged the customer list. And so, by the way, their brief suggests that we didn't file a UCC one against McCraney. We did. It's plain as day to give it $25,000. But what's the value of the customer list since you're the general agent? You know who the customers are, too. Because the agent controls that customer. It's a neighborhood retail relationship. So it's not the list, it's the relationship. Yes. So the list means nothing without the relationship. You know who the customers are, one through 100, and what you're saying is, well, it's not worth much to us because we don't have the relationship. So what he's pledging is the relationship. Yes. Okay. And in that DZ Connect case, that was $580,000. That's how much that was worth. In follow-up on what Judge Martin asked your opponent, let's assume we don't agree with you and we decide this is not a negotiable instrument. What's the legal analysis that follows from that? So as a lender, what you're worried about is the set-off, right? That McRaney would have. He doesn't have any claims against BCC or BCF. He only has claims against Brooke Corporation. At trial, he didn't introduce any evidence to suggest that the corporate veils of those entities should be pierced. So on that basis, he doesn't have any basis to deduct the damages amount, and you should affirm the judgment on that basis. That's how I would answer that question. But I do want to try to persuade you to consider this as a negotiable instrument by focusing on that official comment and then focusing on those more recent cases. If you looked at the Cattrall case, which is the case out of the Eastern District of California, in that case, the note referred to two separate documents, both a security agreement and a separate loan agreement, and the court found that that was also a negotiable instrument. And it looks that what the courts are doing is they're parsing the language down, focusing solely on the payment terms. In other words, whether you have to look at anything other than the note to determine the actual payment. Look, in that regard, I don't have the financial background that Judge Malloy obviously does, but it's a negotiable instrument. It's an unconditional promise to pay, fixed amount of money, payable when it comes into the possession of the holder, is my understanding. And so in the advancement agreement, it's section 13D. There's a provision that says a default by a borrower in performing the obligations and duties of any contract related to borrower's business shall constitute a default under the terms of this agreement. So that sounds like to me the advancement agreement is reaching out to consider the borrower's conduct under these other agreements. I mean, why didn't that take it out of the definition? It's not, Judge Martin, because it's a standard cross-default provision that appears in every loan that every borrower in America signs. I mean, that is just standard boilerplate security agreement, loan agreement language that you'll find in every loan. If a borrower defaults on some other financial obligation with any other creditor that it has, that's typically a default under your debt with your lender. That's just boilerplate industry standard. What about the provision in the advancement agreement that gives non-competition rights to Brooke Corporation? Why doesn't that destroy negotiability? I'm sorry, you're talking about paragraph 13, I think, is it? I think that's right, yeah. My fallback on that is, again, we're focusing solely on whether you need to look at that and you don't. You can look at just the note, determine what the payment obligations are. And that's what the string of cases that we've cited, you know, they've only cited to that one Florida case where the court clearly states that a retail installment contract is not a negotiable instrument. And so they're taking a retail installment contract out of negotiable instruments right away. And then you'll see a thread of cases. One of the cases, and I apologize, talks about the close connectedness doctrine. And they said that that doctrine applies in consumer transactions, but not commercial transactions. We're clearly in the commercial realm here. Actually, it's paragraph 14 that I was talking about, subparagraph C. Remedies upon an effective default. And there's a non-competition, C is a non-competition paragraph. Isn't that an additional undertaking? It is, it is. But my position to you is that because it doesn't affect the payment obligation, in other words, what's due under the note, it's not an undertaking within the concept of negotiable instrument under 306 and 3104. But to the extent, and I just want to reiterate, to the extent that you're inclined to adopt this notion that it's not a negotiable instrument, then I beg you then to focus on what claims that Mr. McCraney would have against Brooke Credit Corporation and or Brooke Credit Funding, because that was the lender. And in the absence of piercing the corporate veil, there's no claim there. They mentioned in their brief at the end that they asked for our cooperation in moving the collateral to a new managing general agent, and we requested they sign an acknowledgement of our debt. But that's not because we had possession of the collateral. We didn't. We only had a security interest in it. And so we were just exercising our rights as a secure party to ensure that we were secured. In other words, we'll cooperate with you, and we did with other agents, provided that you continue to acknowledge our lien interest. But you can't say, I'm not acknowledging anything, and then expect us to agree to allow a transfer of our collateral. We're not going to do that. Well, but part of the argument is what happened in the prior appeal is that you're asking them to acknowledge a debt that two separate parties both say we have valid assignments on. And until you can figure out who he owed the money to, he couldn't be expected to acknowledge it, could he? Well, we knew under the UCC that we had first priority. Yeah, but he didn't. He had a demand letter from you, and he has a demand letter from another entity. They both say we have valid assignments under the UCC. So he's supposed to just assume you're right and they're wrong without... I mean, you went through a whole appeal to the 11th Circuit over that issue and lost. Right. And my argument then was you could affirm on the record, you could affirm based on UCC law at that time. But, I mean, it turned out we were right. I mean, we were proven right, and all of our representations regarding Article 9 were correct. Yeah, but apparently three judges didn't think your letter was enough. No, I agree. I'm not disagreeing, but I'm just saying I don't know that we knew at that very moment in time that another bank was asserting an interest. I mean, I think Mr. McCraney knew, but I don't think D.C. Bank knew, and I don't mean to misrepresent the record. I think that was a view that came out later, October 2008-2009 time frame that that actually arose. But the point is we are the first lien holder. I would beg you to find this to be a negotiable instrument. The Florida case is not controlling. I would beg you to focus on the New York and the California cases and also the Kansas cases that we've cited too. Thank you. Thank you. I'd just like to just address a couple of points raised by opposing counsel. First, I want to make it clear that this is a negotiable, whether this is a negotiable instrument. This was a contract for the sale of goods. I think opposing counsel made reference that this was not a contract for sale of goods. This was a contract to enter into a franchise agreement. I want to be real clear. This was to purchase insurance agency assets. The franchise agreement was a condition of Mr. McCraney purchasing those insurance agency assets. He was purchasing the insurance agency assets. He was going to have to operate as that franchise until it was paid off. And at the time it was paid off, the franchise agreements gets terminated and Brooke Credit has to assign over all of the rights, styles and interests that they had in the insurance agency assets to Mr. McCraney. And I want to also be very clear. I think there was a reference made to that insurance companies don't deal with independent agents. I'm from Lake City, Florida. I also live in Jacksville on the west side. I can tell you there are independent insurance agencies throughout North Florida that are not affiliated with any national broker, national agency that have direct contractual obligations and relationships with those insurance companies. I also just want to get into the negotiability. Again, in the additional terms, I think there's some case law out there. I think opposing counsel cited to several cases. We did cite to the one case from Florida. I want to be clear, though, that you really need to look at the facts. You can look at the law all day long, but you apply the law to the facts. And Kansas law is clear that there cannot be any additional conditions or obligations. And this is the mirror. When you look at the face of the two-page document issue, it says additional terms in all caps, C, Advancement Agreement. I want to ask you about your impairment of capital defense. Let's assume that you can only pursue defenses against Brooke Credit or DZ Bank and not Brooke Corporation. What evidence is there on the record that Brooke Credit specifically prevented McRaney from obtaining agent of record status? He contacted them. There was testimony clearly of Mr. McRaney's numerous emails and phone calls trying to get them to transfer the agent of record status over to Mr. McRaney. Both Brooke and Brooke Credit failed and refused to do that. I think... What about DZ Bank, assuming they had... Well, that is an important issue. DZ Bank, it's convenient. They kind of claim that, oh, we just had a security interest in that. But if they didn't have, they only had a security interest, they contacted Mr. McRaney in October before they foreclosed on the collateral offering to transfer Mr. McRaney the agent of record status. If they were just a secured owner, how would they have the right to do that? Mr. McRaney, though, at that point had already terminated and canceled his agreement. At that point, the insurance companies had already canceled all their relationships with Brooke. In other words, the damage had already been done. Before Mr. McRaney canceled and terminated, he tried, he contacted them, and it's not refuted on the record, to try to get them to transfer the agent of record status to him so he could preserve the collateral. He testified, if I'd have had that, I would have continued paying. I would have had a viable asset. He never received that. And it was only upon the fact when he never received that, when he never got what he bargained to purchase, that he said, and he wasn't getting paid. He was working for free for three months. He canceled the contract. If Brooke Credit impaired the capital, what would be the remedy? Would it be a set off or would it... It would be a set off. And there was testimony. I think there would be an impairment of collateral argument against DZ Bank also. I think DZ Bank, under the agreements that they're claiming, they took ownership of that note, being the amended and restated credit and security agreement. In that document, there was an insurance company that was identified as the backup master agent servicer. That company was there to step in if something happened to either Brooke or to Mr. McCraney. And the testimony at trial was clear that DZ Bank did nothing to try to have that backup master agent servicer come in and protect the collateral. Same thing with Brooke Credit. They did not do anything to protect that. So that valuable asset that could have been sold, I mean, DZ Bank continued to receive payments afterwards. I mean, it was a viable business. It could have been sold. It was worth money. Is there evidence in the record from which we could determine the amount of the set off? Well, there was testimony from Mr. McCraney about the income that was being produced. The unfortunate nature of it is the trial court just never really addressed that issue. Can I ask one other quick question? What happened to the assets? Were they just gone, dissipated, or did DZ Bank make any attempt to sell the agent a record status to some other agent? DZ Bank continued to collect on the premiums that were coming in and nothing else. They did nothing. Mr. McCraney had to walk away from an insurance agency that he spent eight years of his life building. And he only walked away when he stopped getting paid for three months straight. And in the three months, that's when he said, I can't do this anymore. Please give me these assets so I can protect them. They were not provided to him. He just essentially had to walk away and start afresh. Thank you very much. All right. Thank you very much for the presentation. And we'll now hear the fourth case of the day.